Honorable Benjamin H. Settle

Charles Bond, Esq. (SBN 060611)
Matthew Brinegar (SBN 277517)
PHYSICIANS' ADVOCATES
821 Bancroft Way
Berkeley, CA 94710
Telephone: 510.841.7500
Facsimile: 510.841.5022

Attorneys for Plaintiff
DEBORAH CAHILL, M.D.

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| DEBORAH CAHILL, M.D., | NO.  3:12-cv-5829-BHS |
|---|---|
| Plaintiff, | SECOND ~~FIRST~~ AMENDED COMPLAINT |
| v. | |
| FRANCISCAN HEALTH SYSTEM, a Washington non-profit corporation, | |
| Defendant. | |

For her cause of action against Franciscan Health System, Plaintiff Deborah Cahill, M.D. alleges as follows:

### PARTIES

1.      Plaintiff, Deborah Cahill, M.D., ("Dr. Cahill") is an experienced, well respected Board Certified Obstetrician and Gynecologist who has enjoyed a rewarding and distinguished career devoted to caring for the health of women in her community, irrespective of their ability to pay. Over three years ago, Dr. Cahill voluntarily sought treatment with the Washington Physicians Health Program for treatment of alcoholism and has maintained continuous sobriety since enrollment. Dr. Cahill is a resident of King County, WA and a physician duly licensed under the laws of the State of Washington.

1

2.      Defendant Franciscan Health System (hereinafter "FHS") is a large hospital chain and health system organized as a tax-exempt non-profit under IRS Code 501(c)(3) and is based in Tacoma, WA. Defendant FHS owns and operates five full-service hospitals including St. Joseph Medical Center, which is located in Tacoma, WA.

## JURISDICTION AND VENUE

3.      Dr. Cahill re-alleges all allegations set forth in paragraphs 1 through 2 above.

4.      Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction and personal jurisdiction over Defendant FHS in this lawsuit.

5.      Venue properly lies in the Western District of Washington.

## FACTS

6.      Dr. Cahill is a physician, licensed to practice medicine in Washington since December 14, 1984, and Board Certified in the specialty of obstetrics/gynecology.

7.      Defendant FHS is a non-profit IRS Code 501(c)(3) organization.

8.      Defendant FHS owns and operates five full-service hospitals including St. Joseph Medical Center, which is located in Tacoma, WA.  As a full-service hospital, St. Joseph Medical Center has an Obstetrics/Gynecology (OB/GYN) Department.

9.      Defendant FHS and St. Joseph Medical Center receive federal funds.

10.     Washington Physicians Health Program (hereinafter "WPHP") is a non-profit organization. It was founded by the Washington State Medical Association in 1986 to reach out to troubled colleagues. WPHP, which fulfills the role specified in RCW 18.130.175 for a "voluntary substance abuse monitoring program" acting under the authority of the Department of Health, helps identify, refer for evaluation or treatment, monitor the recovery, and endorse the safety of healthcare practitioners who have a condition, mental or physical, which could affect their ability to practice with reasonable skill and safety. WPHP, with its comprehensive curriculum and success rate for long term sobriety, has gained national recognition and widespread support.

//

1       11.    In March, 2009, Dr. Cahill voluntarily, and without any patient care *sequelae*,

2   sought treatment for alcoholism from WPHP with a five year commitment to ongoing

3   monitoring as required by the wellness program.

4       12.    Dr. Cahill has been committed to her recovery, 100% sober and consistently

5   compliant with the intense monitoring component of the WPHP ever since and in accordance

6   with its strict written protocols, including, but not limited to, submission to random urine tests

7   and regular attendance at WPHP-facilitated meetings. Dr. Cahill's written monitoring

8   agreement with WPHP will terminate in July, 2014.

9       13.    After many years in private practice, Dr. Cahill decided to shift her career

10   focus to the role of an OB/GYN Hospitalist to become part of a team that provides care to the

11   uninsured population. To that end, in August of 2010, Dr. Cahill applied for a position with

12   OB Hospitalist Group, a national physician group that specializes in caring for the obstetrical

13   and gynecological needs of patients, to provide coverage for the OB/GYN hospitalist program

14   at St. Joseph Medical Center.

15       14.    OB Hospitalist Group had contracted with Defendant FHS and/or St. Joseph

16   Medical Center to provide Board Certified physicians in the specialty of obstetrics and

17   gynecology to augment the staffing of St. Joseph Medical Center's OB/GYN Department.

18       15.    Dr Cahill accepted an offer of a position with OB Hospitalist Group and signed

19   a contract with OB Hospitalist Group (OB Contract) to cover a minimum of two shifts per

20   month in the OB/GYN Department of St. Joseph Medical Center.

21       16.    The OB Contract required Dr. Cahill to apply for and receive Medical Staff

22   privileges from Defendant FHS.

23       17.    Dr. Cahill timely applied for staff privileges and supplied all of the requested

24   information concerning her licensure, education, training, experience, current competence,

25   health status, and malpractice history. Dr. Cahill signed the required release and consent for

26   Defendant FHS to verify her credentials. As part of Dr. Cahill's application, she was

forthright and fully disclosed her monitoring agreement with WPHP without reservation.

18.     Defendant FHS knew that Dr. Cahill was applying for Medical Staff privileges pursuant to her OB Hospitalist Group Contract.

19.     Upon applying for Medical Staff privileges, Defendant FHS and Dr. Cahill entered into a contract that is memorialized in FHS' Credentials Manual of the Medical Staff Bylaws. (the "Contract") (Attached as Exhibit "A").

20.     The Contract, which was written solely by Defendant FHS and was presented to Dr. Cahill on a "take it or leave it" basis, states that:

> Decisions regarding appointment and granting or denying Clinical Privileges are based on criteria that are directly related to quality of care, and are made on the basis of an applicant's credentials without regard to gender, race, creed, national origin, or any other criteria not related to professional or clinical competence.

(Contract, page 5, subsection C).

21.     The Contract further provides that Defendant FHS' Regional Credentials Committee and/or the Chair will either recommend approval, denial, modification of the requested privileges, or require the physician to provide additional information once the application has been completed.   (Contract, page 7, subsection F, sub-section 4, sub-sub-sections a-d).

22.     A "completed" application is "one where all of the information is found acceptable to the Regional Credentials Committee.  If the information is found to be unacceptable to the Regional Credentials Committee, the application is considered incomplete."

23.     By letter dated October 25, 2010, Defendant FHS, with the approval of the Vice President of Medical Affairs and Associate Chief Medical Officer at St. Joseph Medical Center, informed Dr. Cahill that Defendant FHS "cannot complete your application for staff membership" and that Dr. Cahill "can consider reapplying" for Medical Staff privileges when Dr. Cahill's monitoring agreement with WPHP expires.

24.     In September and October 2011, Defendant FHS confirmed that it "did not complete the processing" of Dr. Cahill's application for medical staff privileges solely

4

SECOND AMENDED COMPLAINT

because Dr. Cahill had a monitoring agreement with WPHP evidencing that Dr. Cahill had sought treatment for alcoholism and was a recovering alcoholic.

25. At no time did Defendant FHS conduct any individualized assessment of Dr. Cahill's ability to practice medicine with reasonable skill and safety consistent with the standards of Defendant FHS and its bylaws.

26. Defendant FHS never made an effort to ascertain what modifications to the Hospitalist position or grant of Medical Staff privileges, if any, were plausible to accommodate Dr. Cahill's actual, record of, or perceived disability as a person suffering from alcoholism.

27. Defendant FHS based its decision to not complete the processing of Dr. Cahill's application for Medical Staff privileges on arbitrary and generalized fears about alcoholics. Defendant FHS's refusal to complete the processing of Dr. Cahill's application is tantamount to a denial of privileges.

28. FHA violated the Contract by evaluating Dr. Cahill's qualifications based upon matters not "directly related to quality of care" or "criteria not related to professional or clinical competence," *i.e.* her status as a recovering alcoholic. (Contract, page 5, subsection C).

29. FHA also violated the implied covenant of good faith and fair dealing that is part of all contracts in Washington State by electing to not "complete" Dr. Cahill's application for Medical Staff privileges in bad faith and for arbitrary and discriminatory reasons, *i.e.* stereotypes concerning alcoholics in general.

28. As a direct and proximate result of the discriminatory inaction of Defendant FHS, its breach of contract, and it breach of the implied covenant of good faith and fair dealing, Dr. Cahill could not fulfill her obligations or perform the requested services under the OB Hospitalist Group Contract.

30. The discriminatory inaction of Defendant FHS, the breach of contract, and the breach of the implied covenant of good faith and fair dealing also induced or caused a breach or termination of the OB Hospitalist Group Contract.

31.     On numerous occasions, Plaintiff Cahill, by and through her attorneys, requested that Defendant FHS withdraw its denial of her application for Medical Staff privileges.

32.     These requests were not honored, even though Plaintiff Cahill, by and through her attorneys, repeatedly informed Defendant FHS that its actions were harming her career and causing her a tremendous amount of stress and anxiety.

33.     On or about September 15, 2013, Dr. Cahill suffered a stress-induced cardiomypoathy that was brought on by extreme stress caused by:

(1) FHS' continuing refusal to withdraw its discriminatory denial of her application for Medical Staff privileges;

(2) the tremendous cost to Plaintiff Cahill to prosecute her civil rights in this matter; and

(3) the anxiety caused by the retaliatory conduct Defendant FHS has engaged in during this litigation, including, but not limited to, alleging pretextual reasons for its discriminatory conduct that impugned Plaintiff Cahill's reputation and ability to practice medicine.

34.     Plaintiff Cahill has been unable to return to work since her stress-induced cardiomypoathy. While the heart attack just occurred, it appears that Plaintiff Cahill will never be able to hold a full time job again.

### FIRST CAUSE OF ACTION:
### Disability Discrimination Under RCW 49.60.030(1)(a)

35.     Plaintiff Cahill re-alleges all allegations set forth above.

36.     Plaintiff Cahill has a disability, a record of a disability, or has been regarded by Defendant FHS as having a disability covered by Washington's Law Against Discrimination.

37.     By denying Plaintiff Cahill equal opportunity to complete her application for, or benefit from, Medical Staff privileges with Defendant FHS on the basis of her disability, Defendant FHS discriminated against Dr. Cahill in the performance of her OB Hospitalist Group Contract to provide services to Defendant FHS.

38.     Plaintiff Cahill has sustained damages as a result of Defendant's unlawful conduct and discriminatory inaction.

### SECOND CAUSE OF ACTION:
### Disability Discrimination Under RCW 49.60.030(1)(b)

39.     Plaintiff Cahill re-alleges all allegations set forth above.

40.     Plaintiff Cahill has a disability, a record of a disability, or has been regarded by Defendant FHS as having a disability covered by Washington's Law Against Discrimination.

41.     Defendant FHS owns and operates St. Joseph Medical Center in Tacoma, WA, a place of public accommodation.

42.     Defendant FHS discriminated against Plaintiff Cahill by denying her equal opportunity to complete her application for, or benefit from, Medical Staff privileges at St. Joseph Medical Center on the basis of her disability.

43.     Plaintiff Cahill has sustained damages as a result of Defendant's unlawful conduct and discriminatory inaction.

### THIRD CAUSE OF ACTION:
### Disability Discrimination Under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181, *et seq.*

44.     Plaintiff Cahill re-alleges all allegations set forth above.

45.     Plaintiff Cahill has a disability, a record of a disability, or has been regarded by Defendant as having a disability covered by the ADA.

46.     Defendant FHS owns and operates St. Joseph Medical Center in Tacoma, WA, a place of public accommodation.

47.     Defendant FHS discriminated against Plaintiff Cahill by denying her a full and equal opportunity to complete the processing of her application for, or benefit from, Medical Staff privileges at St. Joseph Medical Center on the basis of her disability.

### FOURTH CAUSE OF ACTION:
### Disability Discrimination Under the Rehabilitation Act, 29 U.S.C. § 794(a)

48.     Plaintiff Cahill re-alleges all allegations set forth above.

49.     Plaintiff Cahill has a disability within the meaning of the Rehabilitation Act.

7

50.     Plaintiff Cahill is licensed, Board Certified, and is otherwise qualified to practice medicine in a hospitalist position in the State of Washington in the specialty of obstetrics/gynecology.

51.     Defendant FHS refused to complete the processing of Plaintiff Cahill's application for Medical Staff privileges with Defendant FHS solely on the basis of her disability, whether her current disability, her record of a disability, and/or Defendant FHS regarding her as disabled.

52.     Defendant FHS receives federal funds.

53.     Plaintiff Cahill has sustained damages as a result of Defendant's unlawful conduct and discriminatory inaction.

### FIFTH CAUSE OF ACTION:
### Tortious Interference With a Business Expectancy

54.     Plaintiff Cahill re-alleges all allegations set forth above.

55.     The contract between Plaintiff Cahill and OB Hospitalist Group was a valid contractual relationship or business expectancy.

56.     Defendant FHS had knowledge of the OB Hospitalist Group Contract and the business relationship between Plaintiff Cahill and OB Hospitalist Group.

57.     Defendant's unlawful conduct and discriminatory inaction in refusing to complete the processing of Plaintiff Cahill's application for Medical Staff privileges with Defendant FHS solely on the basis of her disability, whether her current disability, her record of a disability, and/or Defendant FHS regarding her as disabled, was intentional interference that induced or caused a breach or termination of the OB Hospitalist Contract with Plaintiff Cahill.

58.     Defendant's unlawful conduct and discriminatory inaction were improper means of interfering with the contractual relationship between Plaintiff Cahill and OB Hospitalist Group.

59.     Plaintiff Cahill has sustained damages as a result of Defendant's interference.

**SIXTH CAUSE OF ACTION:**
**Violation of the Consumer Protection Act, RCW 19.86 et seq.**

60.     Plaintiff Cahill re-alleges all allegations set forth above.

61.     Defendant's unlawful conduct and discriminatory inaction violates RCW 49.60.030(1) and is thus statutorily *per se* "a matter affecting the public interest, is not reasonable in relation to the development and preservation of business, and is an unfair or deceptive act in trade or commerce." RCW 49.60.030(3).

62.     Plaintiff Cahill has sustained damages to her business or property as a direct result of Defendant's unfair trade practice--its unlawful conduct and discriminatory inaction in refusing to complete the processing of Plaintiff Cahill's application for Medical Staff privileges with Defendant FHS solely on the basis of her disability, whether her current disability, her record of a disability, and/or Defendant FHS regarding her as disabled.

**SEVENTH CAUSE OF ACTION:**
**Breach of Contract**

63.     Plaintiff Cahill re-alleges all allegations set forth above.

64.     The FHS' Credentials Manual of the Medical Staff Bylaws was a contract between Defendant FHS and Plaintiff Cahill that governed the terms and conditions under which Defendant FHS would evaluate her application for Medical Staff privileges.

65.     Defendant FHS materially breached the Contract by reviewing Plaintiff Cahill's qualifications based upon matters not "directly related to quality of care" or "criteria not related to professional or clinical competence," *i.e.* her status as a recovering alcoholic. (Contract, page 5, subsection C).

66.     As a direct and proximate cause of Defendant FHS' breach of contract, Plaintiff Cahill suffered damages, including, but not limited to, loss of wages.

**EIGHTH CAUSE OF ACTION:**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

67.     Plaintiff Cahill re-alleges all allegations set forth above.

68.     Defendant FHS violated the implied covenant of good faith and fair dealing that is part of all Washington State contracts by electing to not "complete" Plaintiff Cahill's

9

SECOND AMENDED COMPLAINT

#121209

application for Medical Staff privileges in bad faith and for arbitrary and discriminatory reasons, *i.e.* stereotypes concerning recovering alcoholics in general.

69.     As a direct and proximate cause of Defendant FHS' breach of the implied covenant of good faith and fair dealing, Plaintiff Cahill suffered damages, including, but not limited to, loss of wages.

## NINTH CAUSE OF ACTION
### Intentional and Negligent Infliction of Emotional Distress

70.     Plaintiff Cahill re-alleges all allegations set forth above.

71.     Defendant FHS engaged in extreme and outrageous conduct *i.e.* refused to withdraw its discriminatory denial of Plaintiff Cahill's application for Medical Staff privileges despite repeated requests to do so, and when it knew that Plaintiff Cahill suffered from an extreme amounts of stress and anxiety due to Defendant FHS' continuing discriminatory conduct.

72.     Defendant FHS' conduct was either intentional or reckless. Alternatively, Defendant FHS' conduct was negligent.

73.     As a result of FHS' extreme and outrageous conduct, Dr. Cahill suffered from mental distress that caused a stress-induced cardiomyopathy.

74.     As a direct and proximate cause of Defendant FHS' extreme and outrageous conduct, Plaintiff Cahill suffered damages, including, but not limited to, loss of wages, medical bills, as well as pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, having fully stated her causes of action, Plaintiff prays for judgment as follows:

1.     Loss of income, wages, other compensation, and medical bills;

2.     Damages for emotional distress, mental anguish, loss of reputation and professional standing;

3.     Federal taxes incurred by Plaintiff Cahill as the direct and proximate result of Defendant's illegal conduct;

10

SECOND AMENDED COMPLAINT

#121209

4.      An Order enjoining Defendant FHS from declining to process Dr. Cahill's application for Medical Staff privileges based on her disability;

5.      All other non-economic damages available under any and all of the available causes of action;

6       Costs and attorneys' fees pursuant to RCW 49.60.030(2), 42 U.S.C. § 12181, *et seq.*, the Rehabilitation Act, and the Consumer Protection Act;

7.      All allowable exemplary and punitive damages; and

8.      For such other and further relief as the Court deems just and equitable under the circumstances.

DATED this 19ᵗʰ day of November, 2013      **PHYSICIANS' ADVOCATES**

By: __/s/ Matthew A. Brinegar_____
        Charles Bond (admitted pro hac vice)
        Matthew A. Brinegar (WSBA No. 42361)
        Attorneys for Plaintiff Deborah Cahill, M.D.


**CARNEY BADLEY SPELLMAN, P.S.**


By:__/s/ Kenneth S. Kagan_____
        Kenneth S. Kagan, WSBA No. 12983
        Elizabeth K. Maurer, WSBA No. 21973
        Attorneys for Plaintiff Deborah Cahill, M.D.

11

SECOND AMENDED COMPLAINT

#121209

# EXHIBIT "A"

# ✝ CATHOLIC HEALTH INITIATIVES

## Franciscan Health System

# SECTION 4
# CREDENTIALS MANUAL

**INITIAL APPROVAL BY:**
Regional Credentials Cmte - September 3, 1996
Medical Executive Committee - September 7, 1996
FHS Board of Directors - November 22, 1996

## ANNUAL REVIEW

Reviewed and Amended January 1997
- Approved by the Medical Staff on January 10, 1997
- Approved by the FHS Board of Directors on January 31, 1997

Reviewed and Amended February 1998
- Approved by the Medical Staff on February 12, 1998
- Approved by the FHS Board of Directors on March 26, 1998

Reviewed and Amended May 1999
- Approved by the Medical Staff on June 10, 1999
- Approved by the FHS Board of Directors on July 22, 1999

Reviewed and Amended June 1999
- Approved by the Medical Staff on July 15, 1999
- Approved by the FHS Board of Directors on July 22, 1999

Reviewed and Amended June 2000
- Approved by the Medical Staff on August 8, 2000
- Approved by the FHS Board of Directors on November 30, 2000

Reviewed and Amended May 2001
- Approved by the Medical Staff on August 9, 2001
- Approved by the FHS Board of Directors on September 21, 2001

Reviewed and Amended March 2002
- Approved by the Medical Staff on March 14, 2002
- Approved by the FHS Board of Directors on March 28, 2002

Reviewed and Amended August 2002
- Approved by the Medical Staff on September 12, 2002
- Approved by the FHS Board of Directors on September 26, 2002

Reviewed and Amended 2003
- Approved by the Medical Staff on August 14, 2003
- Approved by the FHS Board of Directors on August 28, 2003

Reviewed and Amended 2004
- Approved by the Medical Staff on June 10, 2004
- Approved by the FHS Board of Directors on July 29, 2004

Reviewed and Amended 2005
- Approved by the Medical Staff on January 13, 2005
- Approved by the FHS Board of Directors on January 27, 2005

Reviewed and Amended 2006
- Approved by the Medical Staff on June 8, 2006
- Approved by the FHS Board of Directors on July 27, 2006

Reviewed and Amended 2007
- Approved by the Medical Executive Cmte on January 11, 2007
- Approved by the FHS Board of Directors on January 25, 2007
- Approved by the Medical Staff on June 7, 2007
- Approved by the FHS Board of Directors on July 26, 2007

Reviewed and Amended 2008/2009
- Approved by the Medical Staff on February 12, 2009
- Approved by the FHS Board of Directors on February 17, 2009

Reviewed and Amended 2009
- Approved by the Medical Staff on August 6, 2009
- Approved by the FHS Board of Directors on September 24, 2009

Reviewed and Amended 2010
- Approved by the Medical Staff on October 14, 2010
- Approved by the FHS Board of Directors on November 18, 2010

Reviewed and Amended 2011
- Approved by the Medical Staff on February 10, 2011
- Approved by the FHS Board of Directors on March 31, 2011

Reviewed and Amended 2012
- Approved by the Medical Staff on March 8, 2012
- Approved by the FHS Board of Directors on March 22, 2012

Reviewed and Amended 2012
- Approved by the Medical Staff June 14, 2012
- Approved by the FHS Board of Directors on July 26, 2012

# CREDENTIALING MANUAL
## OF THE MEDICAL STAFF BYLAWS

### TABLE OF CONTENTS

|  | PAGE # |
|---|---|
| PURPOSE | 3 |
| DEFINITIONS | 3 |
| CONFIDENTIALITY | 3 |
| **ARTICLE I - PROCEDURE FOR APPOINTMENT** | 4 - 9 |
| Section 1. Initial Application | 4 - 8 |
| Section 2. Active Staff Appointment | 8 |
| Section 3. Referring Category | 8 |
| Section 4. Honorary Category | 8 - 9 |
| **ARTICLE II - PROCEDURE FOR REAPPOINTMENT** | 9 - 13 |
| Section 1. Application for Reappointment | 9 - 12 |
| Section 2. Leave of Absence | 12 - 13 |
| **ARTICLE III - CLINICAL PRIVILEGES** | 13 - 20 |
| Section 1. Clinical Privileges | 13 - 14 |
| Section 2. Temporary Clinical Privileges | 14 - 15 |
| Section 3. Locum Tenens | 15 |
| Section 4. Visiting Consultant Privileges | 16 |
| Section 5. Emergency Privileges | 16 |
| Section 6. Resident Scope of Practice | 16 - 17 |
| Section 7. Fellow Privileges | 17 |
| Section 8. Student Scope of Practice | 17 - 18 |
| Section 9. Request for Additional Clinical Privileges | 18 |
| Section 10. Proctor Qualifications | 19 |
| Section 11. One Time Privileges | 19 |
| Section 12. Disaster Credentialing | 19 - 20 |
| Section 13. Telemedicine Privileges | 20 |
| **ARTICLE IV - RELINQUISHMENT OF APPOINTMENT AND/OR CLINICAL PRIVILEGES** | 20 - 21 |
| Section 1. Voluntary Relinquishment of Appointment and/or Clinical Privileges | 20 |
| Section 2. Denial, Revocation, Limitation, Suspension, Reduction of Clinical Privileges | 21 |
| **ARTICLE V - ALLIED HEALTH PROFESSIONALS** | 21 - 24 |
| Section 1. Allied Health Professionals - General | 21 - 22 |
| Section 2. Independent Allied Health Professionals | 22 - 23 |
| Section 3. Dependent Allied Health Professionals | 23 |
| Section 4. Other Health Professionals | 24 |
| **ARTICLE VI - CONFIDENTIALITY OF MEDICAL STAFF CREDENTIALS FILES** | 24 |
| **ARTICLE VII - AMENDMENTS** | 24 |
| **ARTICLE VIII - ADOPTION** | 24 |

## PURPOSE

The Credentialing Manual outlines the uniform credentialing process and the mechanism for granting appointment and reappointment to the Medical Staff as well as the process of evaluating and granting initial Clinical Privileges and renewal of Clinical Privileges for individual members of the Active Medical Staff and Allied Health Professionals. This manual is appended to the Medical Staff Bylaws of the Franciscan Health System, as outlined in Article XII, Section 3 B and is subject to the approval of the Board.

## DEFINITIONS

The definitions provided in the FHS Medical Staff Bylaws shall apply to the Credentialing Manual. In addition, the following shall apply:

1.  Clinical Privileges:

    Authorization granted by the Board to a practitioner to provide specific patient care services in the Hospital within defined limits based on an individual practitioner's license, education, training, experience, competence, health status, and judgment.

2.  Licensed Practitioner:

    Any individual permitted by law and by the Hospital and Medical Staff to provide patient care services within the scope of his or her license, and in accordance with individually granted Clinical Privileges.

3.  The Credentialing Process:

    The process of assessing and validating the qualifications of a licensed practitioner to provide patient care services in a hospital.

4.  Allied Health Professionals (AHP):

    Allied Health Professionals are not members of the Active Medical Staff. AHP are non-physicians (non MD, DO, DDS, DPM,) other than persons employed by FHS or under contract to FHS, who assist in the diagnosis and treatment of patients in FHS or are authorized to perform procedures in the Hospital.

## CONFIDENTIALITY OF INFORMATION AND IMMUNITY FROM LIABILITY

The protections identified in Article X of the Franciscan Health System (FHS) Medical Staff Bylaws shall apply to the Credentials Manual.

## ARTICLE I.   PROCEDURE FOR APPOINTMENT
## TO THE ACTIVE MEDICAL STAFF

The Board has designated the Medical Staff Office its agent to collect and verify data in the credentialing process.

A.    The Board shall appoint and reappoint applicants to the Medical Staff and grant initial, renewed, or revised Clinical Privileges, considering the Medical Executive Committee's recommendations, in accordance with the Bylaws, Rules and Regulations, and policies of the Medical Staff and of the Hospital.

B.    Appointment to the Active Staff category is granted after a review of all documents related to the applicant.  Criteria for Medical Staff appointment and for Clinical Privileges are established by the Regional Credentials Committee of the Medical Staff, are uniformly applied to all applicants, and constitute the basis for granting Medical Staff appointment and Clinical Privileges.

C.    Decisions regarding appointment and granting or denying Clinical Privileges are based on criteria that are directly related to quality of care, and are made on the basis of an applicant's credentials without regard to gender, race, creed, national origin, or any other criteria not related to professional or clinical competence.

D.    Subsequent appointments and reappointments and granting, renewing, or revising Clinical Privileges shall be for a period of not more than two (2) years.

E.    A separate credentials file is maintained for each individual requesting Medical Staff membership and/or Clinical Privileges.

F.    Upon appointment to the Medical Staff each member will be assigned to a Clinical Section (Medical Staff groups of like specialty, practice or clinical interest).

### SECTION 1.   INITIAL APPLICATION

A.    The initial application to the Medical Staff shall be in writing, signed by the applicant, and submitted on a form specified by FHS. The application form shall require detailed information concerning the applicant's license, education, training, experience, current competence, health status, privileges requested and malpractice history.

   1. The application requirements are:

      a.  Current and unrestricted Washington State license.

      b.  Current Federal Drug Enforcement Agency (DEA) Certificate where applicable.

      c.  Evidence of an approved residency recognized by the Accreditation Council for Graduate Medical Education, American Osteopathic Association, American Dental Association or American Podiatric Medical Association.

    d. Board certification or board admissibility by the professional board recognized by the American Board of Medical specialties (ABMS), the American Osteopathic Association (AOA), the American Dental Association (ADA), the American Council of Certified Podiatric Physicians & Surgeons (ACCPPS) or the Board(s) recognized by the American Podiatric Medical Association (APMA) in the clinical specialty where privileges are requested. Allied Health Professionals must demonstrate board certification or board admissibility by a nationally recognized board applicable to their specific specialty and as approved by the Regional Credentials Committee.

        1) If not board certified at the time of initial appointment, it is required that board certification will be achieved within the timeframe established by the practitioner's specialty board.

        2) If there is no time-frame established by a practitioner's specialty board, board certification will be achieved within five (5) years of FHS membership.

        3) This requirement applies to those providers who join the Medical Staff after March 1, 2005. Medical staff members with staff membership granted on or before March 1, 2005, shall be "grandfathered" and be exempt from this requirement.

        4) The Credentials Committee may, on a case-by-case basis and with due consideration of the provider's performance, recommend exceptions to the board certification requirement provision.

    e. Verification that the practitioner requesting approval is the same practitioner identified in the credentialing documents by viewing a valid picture ID issued by a state or federal agency (e.g., driver's license or passport)

    f. Evidence of professional liability insurance coverage, including prior acts coverage for claims made policies that meet the criteria specified by the Board. Minimum professional liability insurance coverage requirements are $1M/$3M.

    g. Residence and office location sufficiently close to the hospitals to provide continuous patient care, especially in emergencies.

B. By applying for appointment to the Medical Staff, each applicant signs a release of information that consents to the inspection of records, authorizes and requests that the Medical Staff Office at FHS verify his or her credentials. The release for information is a part of the initial application for appointment and reappointment.

C. The completed application, along with a non-refundable application fee, shall be returned to the Medical Staff Office within thirty (30) days from the date of issue. Incomplete applications and/or applications submitted without the application fee shall not be processed and shall be returned to the applicant for completion. The applicant has thirty (30) days to resubmit the completed application. If there is no communication or the completed application is not received within that time, the application is considered withdrawn, and the applicant will be so notified.

D. The applicant has the burden of completing the application form and producing adequate information for proper evaluation of his or her competence, character, ethics, and if

requested, health status, and other qualifications for resolving any doubts about such qualifications. In all cases, the applicant has thirty (30) days in which he/she ensures that the Medical Staff Office is in receipt of the requested information. If the information is not received within that time frame, the applicant will be notified via certified letter that the application is withdrawn. Should the applicant wish to resume the application process, he or she will submit a completed application form with all supporting documents.

E. The Medical Staff Office shall verify from primary sources the information provided by the applicant and collect additional information wherever necessary. Verifications will include but is not limited to:

1. Verification of all current and past state medical or professional license(s) and DEA certificate (if applicable) from primary sources.

    a. WA state license and DEA certificate (if applicable) shall be verified at time of initial granting, renewal or revision of privileges and at time of expiration.

2. Information held by the Secretary of the Department of Health and Human Services or agency designated by the Secretary; pursuant to the Health Care Quality Improvement Act of 1986 including the National Practitioner Data Bank and Medicare/ Medicaid Sanctions.

3. Verification of medical/professional education; internship; residency; fellowship; specialty board (where applicable); malpractice history, current and previous hospital affiliations, professional peer references, military experience, current and past employment (if relevant), and obtain the Washington State Patrol background check.

4. Information concerning the applicant's professional ethics, competence, clinical judgment, clinical and technical skills, physical and mental health, and relationships with patient, peers, hospital and Medical Staff. A statement regarding whether or not the applicant has accepted voluntary or involuntary relinquishment of license, DEA registration, Medical Staff membership, voluntary or involuntary limitation, reduction, or loss of Clinical Privileges at any health care facility.

5. Any adverse or derogatory information which could adversely affect the harmonious relationship with the Medical Staff.

F. Upon completion of the application, verification of its contents and receipt of additional information, the credentials file with all related materials will be forwarded to the Medical Staff Office for appropriate peer review and evaluation.

1. A completed application is one where all of the information is found acceptable to the Regional Credentials Committee. If the information is found to be unacceptable to the Regional Credentials Committee, the application is considered incomplete.

2. The Clinical Section Chief, or the designated peer reviewer, shall review the applicant's credentials file and provide a summary of the review. The reviewer shall determine if the education, training, experience, current competence and health status and all other information in the credentials file supports the applicant's request for privileges and/or appointment to the Medical Staff of FHS Hospital. The

reviewer's comments and recommendations will be documented in the applicant's credentials file and in the Regional Credentials Committee minutes.

3. As a part of the process of evaluating an applicant the Regional Credentials Committee may require that an applicant undergo a physical and/or mental exam by a physician or physicians satisfactory to the Regional Credentials Committee and that results of such exam be made available to the Regional Credentials Committee for review. Failure to obtain the requested examination within thirty (30) days after being requested to do so in writing by the Regional Credentials Committee, shall constitute an incomplete application and a voluntary withdrawal of the application for appointment and Clinical Privileges, and all processing of the application shall cease.

4. Based on the information in the applicant's credentials file, the Regional Credentials Committee and/or Chair may:

   a. Recommend approval.

   b. Recommend denial.

   c. Recommend modification of requested privileges.

   d. Require the applicant to provide additional information to enable the committee to appropriately assess education, training, experience and other concerns regarding privileges requested, and/or require an interview.

5. Within thirty (30) days of receipt of completed file, the Regional Credentials Committee shall provide a written report of the review to the Medical Executive Committee.

6. If the report is adverse to the practitioner, the report shall include the reasons for such adverse report.

G. The Medical Executive Committee at its next regularly scheduled meeting, shall consider the written findings and recommendations of the Regional Credentials Committee.

   1. The Medical Executive Committee may:

      a. Recommend approval of appointment/reappointment with privileges.

      b. Recommend denial.

      c. Recommend modification or supervision of Clinical Privileges.

   2. If the recommendation is adverse to the applicant, the applicant will be notified of the decision and the reasons for the recommendation.

   3. The recommendation of the Executive Committee is transmitted (with or without comment) to the Professional Affairs and Quality Committee of the.

H. The Professional Affairs and Quality Committee of the Board, at its next regularly scheduled meeting, shall review the reports from the Regional Credentials Committee and the Medical Executive Committee regarding applications for appointment or

reappointment and initial granting, revisions or revocation of Clinical Privileges and forward their recommendation to the Board.

I.     The Board makes the final decision on all Medical Staff applications for appointments and reappointments, and the granting, revision, or denial of Clinical Privileges. The Board is not bound by the recommendations of the Medical Executive Committee or the Professional Affairs and Quality Committee.

J.     Upon the final decision of the Board, the Chief Executive Officer or a representative of the Board, shall inform the applicant in writing of the Board's decision.

## SECTION 2. ACTIVE STAFF APPOINTMENT

A.     Appointees to the Active Staff category are fully licensed physicians, dentists, and podiatrists who meet the Active Staff Category qualifications of Article I, Section 1 of the Medical Staff Bylaws. Active Staff appointees select a Campus where they will vote and where they will fulfill the obligations of Active Medical Staff membership.

B.     Initial appointment on the Active Staff shall be for a provisional period of not less than twelve (12) months and not more than twenty-four (24) months. During the provisional period the practitioner's hospital practice is evaluated for compliance with applicable Medical Staff policies, rules and regulations and community standards. The provisional status will be reviewed on the practitioner's birth month following a period of at least twelve (12) months and shall constitute the first reappointment to the Medical Staff.

## SECTION 3. REFERRING CATEGORY

A. Appointees to the Referring category are fully licensed physicians, dentists, and podiatrists who do not meet the Active Staff Category qualifications of Article I, Section 1 of the Medical Staff Bylaws and for those who do not seek Hospital practice privileges. This category may also apply to practitioners who do not intend to admit and/or treat patients in the Hospital. Hospital privileges shall not be offered.

B. Referring appointees are not eligible to admit patients to the Hospital or to exercise Clinical Privileges in the Hospital. They may attend educational meetings or committees meetings for education purposes.

C. Referring appointees shall follow the same process for initial, provisional and reappointment as outlined for the Active Staff category with no requirement for Board Certification.

## SECTION 4. HONORARY CATEGORY

A.     The Honorary category shall consist of physicians, dentists and podiatrists recognized for their outstanding reputation, their noteworthy contributions to FHS and the community or their previous long-standing service to the Hospital. The designation as Honorary Staff

shall be conferred by the Board upon the recommendation of the Medical Executive Committee.

B.   Honorary appointees are not eligible to admit patients to the Hospital or to exercise Clinical Privileges in the Hospital.  They may attend Staff and Hospital educational meetings.  Honorary appointees are not eligible to vote or hold office in the Medical Staff organization, or serve on standing Medical Staff committees.

## ARTICLE II.   PROCEDURE FOR REAPPOINTMENT

A.   Reappointment to the Medical Staff shall be made by the Board.  The Board shall act on the reappointment application upon receipt of a recommendation from the Medical Executive Committee.

B.   Appraisal for reappointment or renewal or revisions of Clinical Privileges shall be uniformly applied to each applicant on the Medical Staff and shall be made for a period not to exceed two (2) years.

C.   Reappointment to the Medical Staff and the reappraisal of Clinical Privileges shall be based on information concerning the individual's professional performance, judgment, quality information, and clinical and technical skills.  In addition, evidence of current ability to perform the privileges requested shall be documented in the applicant's credentials file and considered a basis for granting renewal or revision of Clinical Privileges.

D.   The Clinical Section Chief may evaluate the applicant's ability to perform the privileges requested, or may request an evaluation from someone on the Medical Staff who is a peer of the applicant.  The written report of the evaluation will be incorporated into the reappointment process.

### SECTION 1.   APPLICATION FOR REAPPOINTMENT

A.   The Medical Staff Office will initiate the reappointment process at least six (6) months prior to the expiration of the current appointment.

B.   Application for reappointment to the Medical Staff shall be in writing.  Each current member who is eligible for reappointment shall be responsible to complete the reappointment application and return same in a timely manner to the Medical Staff Office.

C.   The reappointment application shall include the following information:

1.   Complete and current information regarding current license, health status changes, professional liability insurance coverage and experience, other hospital affiliation(s), previously successful and currently pending challenges to any licensure or registration (State or Drug Enforcement Administration), the voluntary or involuntary relinquishment of such licensure or registration.

2.   A signed release and immunity from civil liability statement.

3.  Completion of a new privilege form with documentation supporting any request for new privileges/procedures.

4.  Statement regarding whether or not the applicant has been involved in disciplinary actions from the any medical, dental or podiatric board or medical society.

5.  Statement regarding whether or not the applicant has been charged in any criminal proceedings.

6.  Statement as to whether or not the applicant's clinical privileging status, medical/dental/podiatric Staff status, or appointment at any health care facility, has been revoked, denied, restricted reduced, suspended, terminated or granted with stated limitations or conditions.

7.  Health statement indicating whether or not the applicant can safely perform the essential functions of the position for which he or she is requesting privileges with or without reasonable accommodation.

D.  The Staff member bears the burden of producing all information needed to evaluate the application in the same manner as stated in Article I, Section 1 in connection with the initial application.

E.  By applying for reappointment to the Medical Staff and renewal, revision of Clinical Privileges on the Medical Staff, each applicant agrees to the same conditions outlined in Article I, Section 1 of this manual.

F.  The application for reappointment shall be returned to the Medical Staff Office within thirty (30) days from date of issue.  Incomplete reappointment applications will not be processed and will be returned to the applicant for completion.  If there is no communication within the subsequent thirty (30) days, a certified letter will be sent informing the applicant that he/she has an additional two (2) weeks to respond, after which he/she will be dropped from Staff for failure to reapply.  This will be considered a voluntary resignation for failure to reapply to the Medical Staff and is not subject to fair hearing and due process and is not reportable to the National Practitioner Data Bank.  If an applicant is under investigation, or has been informed that he/she is under investigation which might lead to corrective action or suspension, FHS is under obligation to report the withdrawal to the National Practitioner Data Bank. Resignation in lieu of formal action will not be accepted.

G.  Upon completion of the verification process of the reappointment application, the following information will be considered for reappointment and renewal or revision of Clinical Privileges:

1.  Professional ethics, competence, and clinical judgment in the treatment of patients.

2.  Physical and mental health status.

3.  Compliance with Hospital policies and Medical Staff Bylaws, Rules and Regulations and the procedural policies and the Ethical and Religious Directives for Catholic Health Facilities.

4. Cooperation and relations with other practitioners, and general attitude toward patients, the Hospital and the public.

5. Satisfactory completion of continuing education requirements as may be imposed by the law, this Hospital or applicable accreditation agencies.

6. Individual's clinical and technical skills as indicated in part by the results of performance improvement or other monitoring functions.

7. Voluntary or involuntary termination of Medical Staff membership or voluntary or involuntary limitation, reduction, or loss of Clinical Privileges at this or another health care facility.

8. Other reasonable indicators of continuing qualifications including information found in the individual's credentials file.

9. Current professional liability insurance status, pending malpractice challenges, including claims, lawsuits, judgments and settlements.

10. Information from the National Practitioner Data Bank; Medical Board; Medicare or Medicaid sanctions or reports.

H.  The Medical Staff Office will provide reappointment profile(s) reflecting statistical and clinical activity data, performance evaluation, improvement and peer review information to support the renewal of Clinical Privileges. The information will be considered at the time of reappointment. The information may include but is not limited to:

1. Outcomes of performance improvement activities.

2. Non-use of privileges for high-risk procedure or treatment over a period of two (2) years.

3. Hospital utilization review data; infection control, drug usage review and blood usage review statistics.

4. Any unfavorable outcomes that have been attributed to the practitioner's knowledge, skill, or judgment based on findings and conclusions of peer review actions.

I.  The Medical Staff Office will forward the reappointment application and accompanying documents for evaluation and review by the Chief of Section and then to the Regional Credentials Committee.

J.  Review by the Chief of Section, the Regional Credentials Committee, the Medical Executive Committee and approval by the Board will follow the same procedure outlined in Article I, Section 1, paragraphs F through J of this manual.

K.  In the event of an adverse decision by the Board, the Chief Executive Officer or a Board designee, shall promptly notify the practitioner of its decision by certified mail, return receipt requested, and inform him/her of the right to appeal under the provisions of Article VII, Panel Review Hearing of the Medical Staff Bylaws.

FRANCISCAN HEALTH SYSTEM
CREDENTIALS MANUAL OF THE MEDICAL STAFF BYLAWS

1.    Any Active Medical Staff member has a right to a hearing/appeal pursuant to the Hospital's Fair Hearing Plan.

2.    Adverse actions that affect a practitioner's appointment or status as a member of the Active Medical Staff or the exercise of Clinical Privileges are as follows:

   a.  Denial of  Staff appointment/reappointment.

   b.  Revocation of Staff appointment.

   c.  Denial or restriction of requested Clinical Privileges.

   d.  Reduction in Clinical Privileges.

   e.  Revocation of Clinical Privileges.

   f.  Mandatory consultation requirements.

L.    Limitation on Reapplication for Membership.  No practitioner whose application for Medical Staff membership or reappointment on the Medical Staff has been denied, or whose membership has been finally terminated by corrective action or suspension shall be permitted to submit another application requesting such membership for a period of at least two (2) years from date of final action. The Board may, on a case by case basis and for good reason, make exceptions to this provision.

## SECTION 2.   LEAVE OF ABSENCE (LOA)

A.    A member of the Active Medical Staff or Allied Health Professional Staff may, for good cause, be granted a leave of absence by the Board for a definite stated period of time not to exceed one (1) year.  An absence for longer than one (1) year will constitute a voluntary resignation of Medical Staff/Allied Health Professional Staff appointment and termination of Clinical Privileges unless an exception is made by the Board.

   1.  A request for a leave of absence shall be made in writing to the President of the Medical Staff, the Chief Executive Officer of FHS, or the Chief Medical Officer.  The request shall state the beginning and ending dates.  Concurrence of the Clinical Section Chief is recommended.

   2.  The Medical Executive Committee will consider the leave of absence request at its next regularly scheduled meeting and shall recommend approval or denial to the Board.

   3.  A leave of absence request submitted in lieu of potential corrective action or suspension will not be considered.

   4.  In the event that a leave of absence request is denied, the practitioner can either continue his/her Medical Staff/Allied Health Professional Staff appointment with privileges, or resign from the Medical Staff/Allied Health Professional Staff.

5. Before a leave of absence is granted, the practitioner must have completed all medical records and fulfilled any other Medical Staff/Allied Health Professional Staff obligation required as a condition of membership on the Medical Staff.

6. At the conclusion of the leave of absence, the individual shall be reinstated, through the reappointment process. Practitioner shall document professional activity during leave of absence period. Temporary Clinical Privileges shall only be considered if the practitioner meets either of the following circumstances:

   a. To fulfill an important patient care need, or

   b. When a practitioner with a complete, clean application is awaiting review and approval of the Medical Executive Committee and the Board.

   c. Temporary privileges are granted as a courtesy.

## ARTICLE III.   CLINICAL PRIVILEGES

**SECTION 1.  CLINICAL PRIVILEGES**

A.     Every practitioner at FHS by virtue of Medical Staff membership or otherwise, in connection with such practice, shall be entitled to exercise those Clinical Privileges specifically granted to him or her by the Board, except as provided in Sections 2 and 3 of this Article III.

B.     Every application for initial appointment or reappointment must contain a request for Clinical Privileges (excluding the Referring Category) submitted on the appropriate delineation of privilege form.  The evaluation of such requests shall be based upon the applicant's education, training, experience, demonstrated competence, references and other relevant information.  The applicant shall have the burden of establishing his or her qualifications and competency for the Clinical Privileges requested.

C.     Periodic renewal or revision of Clinical Privileges and the increase or curtailment of same shall be based upon the direct observation of care provided, review of records of patients treated in this or other hospitals, and review of the records of the Medical Staff which document the evaluation of the member's participation in the delivery of medical/ surgical care and information gathered in the performance improvement process of the Hospital.

D.     Professional Practice Evaluation consists of two phases:

   1. Focused Professional Practice Review (FPPE)

      a. FPPE consists of an evaluation that will be conducted to confirm current competence for the following circumstances:

         1) New Appointments:  All practitioners initially appointed; provisional status as outlined in the Medical Staff Bylaws.

      2)  New Privilege Requests:  All practitioners requesting new privileges not previously requested; when the new requested privilege is significantly different from current practice.

      3)  Below Threshold/Peer Review:  Any instance a practitioner shows below standard performance or if the results of an Ongoing Professional Practice Evaluation (OPPE) indicate a potential issue with physician performance.

      4)  Low Activity: When a privilege/procedure is used infrequently.

b.  FPPE may consist of:

      1)  Monitoring and proctoring of performance as dictated by the FHS Credentials Committee's review of the applicant's request for membership and privileges. All proctoring must abide by FHS Professional Proctoring Policy.

      2)  Focused review of cases, by volume, outcome, complication rates, returns to the hospital, post discharge surveillance data- all compared to peer group comparisons, and adjusted where possible for acuity.

      3)  FPPE is completed and used for advancement at the time of provisional to full active appointment    or whenever any of the above-stated circumstances occur.

2.  Ongoing Professional Practice Review (OPPE)- consists of :

a.  Ongoing review of cases, by volume, outcome, complication rates, returns to the hospital, average length of stay, average cost by case, post discharge surveillance data- all compared to peer group comparisons, and adjusted where possible for acuity

b.  Review of participants peer review experience, grievances, incident reports, litigation/claims, patient satisfaction data, and CMS Core Metric report cards.

c.  OPPE is done concurrent with the reappointment cycle, and the data used is presented to the section chief, the Chief Medical Officer (or designee), and available to the Credentials Committee.

## SECTION 2.  TEMPORARY CLINICAL PRIVILEGES

A.  Temporary privileges shall only be considered if the practitioner meets either of the following circumstances:

1.  To fulfill an important patient care need;

2.  When an applicant with a complete, clean application is awaiting review and approval of the Medical Executive Committee and the Board.

B.  Temporary privileges may be considered only when all documentation has been received and verified and there are no significant questions concerning the applicant's qualifications.

C.    Upon review and recommendation of the peer reviewer, if applicable, the Chief of Section, the Chief Executive Officer or designee, may grant temporary admitting and Clinical Privileges to the applicant for a period not to exceed one hundred-twenty (120) consecutive days.  In exercising such privileges, the applicant shall act under the supervision of the Clinical Section Chief in the specialty where privileges have been extended.  Granting of such temporary privileges shall have no bearing on final acceptance of rejection for Medical Staff appointment or granting of Clinical Privileges.

D.    Special requirements of supervision and reporting may be imposed by the Clinical Section Chief and/or the Regional Credentials Committee on any practitioner granted temporary privileges.  Temporary privileges shall be immediately terminated by the Chief Executive Officer, or designee, upon notice of the practitioner's failure to comply with any such special conditions.

E.    The Chief Executive Officer or designee, may at any time, upon the recommendation of the Executive Committee or the Clinical Section Chief, terminate a practitioner's temporary privileges effective with the discharge of the practitioner's patient(s) in the Hospital.  However, where it is determined that the life or health of such patient would be endangered by continued treatment by the practitioner, the termination may be imposed by any person entitled to impose precautionary suspension pursuant to Article VI, Section 2 of the Medical Staff Bylaws, and shall be immediately effective. The Clinical Section Chief or in his absence the President of the Medical Staff shall assign a member of the Medical Staff to assume responsibility for the care of such patient(s) until discharge from the Hospital.  The wishes of the patient shall be considered in the selection of such substitute practitioner(s).

F.    Temporary privileges are granted as a courtesy.  Should temporary privileges be denied, revoked, or modified, the practitioner will not be entitled to any of the corrective action and due process rights of an Active Medical Staff member.

## SECTION 3.   LOCUM TENENS

After review and recommendation of an application and verification of its contents by the Chief of Section or designee, the Chief Executive Officer or designee may permit a physician or Allied Health Professional serving as a locum tenens for a member of the Active Medical Staff or Allied Health Professional Staff, to attend patients without applying for Medical Staff membership for a period not to exceed ninety (90) consecutive days in a twelve (12) month period.  Under extraordinary circumstances, this timeframe may be extended by the Board on a case by case basis in sequential 90 day increments.

A.    Locum tenens may be extended or renewed only once by providing the Medical Staff Office with a letter explaining the "extraordinary circumstances" prior to the expiration of the coverage rotation. Letter of explanation shall come from the practitioner office requesting the locum tenens coverage.  All other extensions or renewals to the medical or allied health medical staffs will require completion of a full application.

B.    If at anytime professional liability coverage is terminated, locum tenens membership and privileges will be terminated.

FRANCISCAN HEALTH SYSTEM
CREDENTIALS MANUAL OF THE MEDICAL STAFF BYLAWS

## SECTION 4.   VISITING CONSULTANT PRIVILEGES

Under extraordinary circumstances an appropriately trained practitioner shall be permitted to consult, assist in the care of, and to treat or teach by demonstration. The Chief Executive Officer or designee shall make a recommendation upon review of an application and verification of its contents. This is usually limited to seventy-two (72) hours in any one calendar year but may be extended by the Board. This category of privileges is intended to allow utilization of nationally and internationally recognized consultants whose services and skills may benefit the patient and are not readily available in this community. It is not intended to bypass the standard credentialing and privileging of those planning to practice in FHS. Concurrent care must be provided by an appropriately credentialed member of the Active Medical Staff who is ultimately responsible for the admission, discharge and follow-up care.

## SECTION 5.   EMERGENCY PRIVILEGES

A.      For the purposes of this section, an "emergency" is defined as a condition which would result in serious permanent harm to a patient, or in which the life of a patient is in immediate danger and any delay in administering treatment would add to that danger.

B.      In the case of an emergency, any member of the Medical Staff, to the degree permitted by his/her license, shall be permitted and assisted to do everything possible to save the life of a patient, using every facility of the Hospital necessary, including the calling for any consultation necessary or desirable. When an emergency situation no longer exists, such practitioner must relinquish care of the patient if not already privileged to continue care. The wishes of the patient shall be considered where feasible in the selection of a Staff member to continue care.

## SECTION 6.   RESIDENT SCOPE OF PRACTICE

A.      Resident Scope of Practice may be requested by submitting an application to the Medical Staff Office. Residents are not afforded membership on the Active Medical Staff but may, through the residency program, request and be granted a scope of practice valid only during rotations at FHS facilities.

B.      Resident scope of practice may be granted to qualified practitioners not licensed in the State of Washington under limited circumstances:

1.      When a current affiliation agreement exists between the Residency Training Program and Franciscan Health System.

2.      The resident is enrolled in a training program approved by the Accreditation Council for Graduate Medical Education (ACGME) or the American Osteopathic Association (AOA) or the American Podiatric Medical Association.

C.      Residents must provide:

1.      Evidence of professional liability insurance as required by the Board.

2.      A current Washington State license (if applicable), OR if a uniformed service member, must have a current license in good standing from another State.

    3.  A profile verifying educational degrees (AMA, AOA or DASG Profile).

D.  Residents may only function under the direct supervision of the Program Preceptor and within the scope of practice approved for the rotation.

E.  Residents are afforded the same courtesies as Medical Staff members except they may not vote or hold office.  When completing a FHS rotation, residents scope of practice to provide any and all care shall automatically cease without prejudice and without entitlement to due process procedures.  This resignation or withdrawal is not reportable to the National Practitioner Data Bank.  The resident may apply for Medical Staff membership by following procedures outlined beginning with Article I of this manual.

F.  Residents may be considered only when all required documentation has been received and verified and there are no significant questions concerning the applicant's qualifications.

G.  As a process of monitoring and evaluating all resident programs, the Regional Credentials Committee will serve as the Oversight Committee.  The Regional Credentials Committee shall have the authority to review and make a recommendation to the Medical Executive Committee regarding all residents and policy issues regarding FHS residency programs.

## SECTION 7.  FELLOW PRIVILEGES

A.  Physicians in a fellowship program may apply for membership and privileges by submitting an application to the Medical Staff Office and are afforded membership of the Medical Staff.  Fellows shall follow the credentialing procedures outlined beginning with Article I of this manual.

## SECTION 8.  STUDENT SCOPE OF PRACTICE

A.  Student Scope of Practice may be requested for by submitting an application to the Medical Staff Office.  Students are not afforded membership on the Active Medical Staff but may, through the application process request and be granted scope of practice during rotations at FHS facilities.

B.  Student scope of practice may be granted to qualified students not licensed in the State of Washington under limited circumstances:

    1.  When a current affiliation agreement exists between the Student University Training Program and Franciscan Health System.

    2.  The student is enrolled in a training program approved by the Accreditation Council for Graduate Medical Education (ACGME) or the American Osteopathic Association (AOA) or the American Podiatric Medical Association.

C.  Students must provide:

    1. Evidence of professional liability insurance as required by the Board.

        2. A current Washington State license (if applicable), OR if a uniformed service member, must have a current license in good standing from another State.

D.     Students may only function under the direct supervision of the Program Preceptor and within the scope of practice approved for the rotation.

E.     When completing a student rotation at FHS, the student's scope of practice to provide any and all care shall automatically cease without prejudice and without entitlement to due process procedures. This completion of rotation is not reportable to the National Practitioner Data Bank.

F.     Students may be considered only when all required documentation has been received and verified and there are no significant questions concerning the applicant's qualifications.

G.     As a process of monitoring and evaluating all student programs, the Regional Credentials Committee will serve as the Oversight Committee. The Regional Credentials Committee shall have the authority to review and make a recommendation to the Medical Executive Committee regarding all students and policy issues regarding FHS student programs.

## SECTION 9.   REQUEST FOR ADDITIONAL CLINICAL PRIVILEGES

A.     Requests for additional privileges may be made at any time. The request shall be made in writing on the appropriate privilege form. The request shall state in detail the specific additional Clinical Privileges desired and the appointee's relevant recent training and experience which justify increased privileges. The request for additional privileges will be processed in the same manner as an initial application. Each applicant agrees to the same conditions outlined in Article 1, Section 1 of this manual.

B.     Proctoring for new procedures. The appropriate section chair or Medical Director or the Regional Credentials Committee may require proctoring for a new privilege. This requirement will be based upon the complexity of the subject procedure, risks involved, and similarity or dissimilarity to procedures for which the provider is currently privileged. At the completion of each proctored case, the proctoring provider will be required to complete and submit a proctor report regarding the competence of the proctored provider in the subject procedure.

C.     Recommendation for an increase in Clinical Privileges made to the Board shall be based upon:

        1. Relevant recent training and/or education;

        2. Observation of patient care provided;

        3. Review of records of patients treated in this or other hospitals;

        4. Results of the Hospital's quality improvement and assessment activities; and

        5. Any other reasonable indicators of the individuals continuing qualifications for the privileges in question.

## SECTION 10: PROCTOR QUALIFICATIONS

A proctor must be a practitioner who has recognized proficiency or documented expertise in the specialty area being proctored. In order to be eligible to be a proctor at Franciscan Health System, practitioners must meet one of the following criteria:

A.   Be a member of the Franciscan Health System Active Medical Staff in good standing and credentialed and privileged at Franciscan Health System for the procedure/privilege being proctored.

B.   Apply for and be granted "Visiting Consultant Privileges" in accordance with Article III, Section 4 of the Credentials Manual of the Franciscan Health System Medical Staff Bylaws and meet FHS credentialing and privileging standards. Proctors must hold the privilege for the procedure/privilege they will proctor at an accredited health care facility. Proctors who meet this criterion must be approved by the Chief Medical Officer or designee prior to the proctoring.

C.   Proctoring may be performed outside of Franciscan Health System facilities but must be approved by the Chief Medical Officer or designee in advance (facility and proctor). Proposed proctors must hold the privilege for the procedure/privilege they will proctor at their own health care facility.

## SECTION 11: ONE TIME PRIVILEGES

A.   One time privileges to care for a specific patient may be granted by the Chief Medical Officer or designee to a practitioner who is not on the Medical/Allied Health staff of Franciscan Health System, and who does not intend to pursue appointment.

B.   The practitioner's one time privileges shall automatically terminate effective with discharge of the patient, however, where it is determined that the life or health of such patient would be endangered by continued treatment by the practitioner, termination may be imposed by any person entitled to impose a precautionary suspension pursuant to Article VI, Section 2 of the Medical Staff Bylaws, and shall be effective immediately. If one time privileges are denied, revoked, or modified, the practitioner will not be entitled to any of the corrective action and due process rights of an Active Medical Staff member.

C.   One time privileges will be granted for the care of one patient per calendar year only.

## SECTION 12: DISASTER CREDENTIALING

A.   In the event that the FHS Incident Command System is implemented, privileges may be granted to volunteer medical staff and Allied Health Professionals in accordance with the FHS Emergency Management Disaster Credentialing Procedure, Policy #504.70.

B.   The decision whether or not to authorize the use of volunteer staff and the degree to which they will be allowed to practice in the event of a community wide disaster will be at the sole discretion of the Hospital President or his/her designee. To the degree permitted by his/her license, the volunteer, licensed independent practitioners may be granted privileges to do everything possible to save the life of a patient, using every

facility of the Hospital necessary, including the calling for any consultation necessary or desirable. Based on the oversight of each volunteer, licensed independent practitioner, the Hospital determines within 72 hours of the practitioner's arrival if granted disaster privileges should continue. When there is no longer a need for the volunteer staff, such practitioner must relinquish their privileges.

C.    Primary source verification of licensure of individuals who receive disaster privileges shall begin as soon as the immediate situation is under control or within 72 hours from the time the volunteer, licensed independent practitioner presents to the organization. In the extraordinary circumstance that primary source verification cannot be completed within 72 hours, it will be done as soon as possible. In this extraordinary circumstance, there must be documentation of why it could not be performed in the required timeframe, evidence of a demonstrated ability to continue to provide adequate care and evidence of the Hospital's attempts to perform primary source verification as soon as possible. Primary source verification of licensure would not be required if the volunteer practitioner has not provided care, treatment and services under the disaster privileges. Verification will be processed according to Article III, Section 2 (Temporary Privileges) of the Credentials Manual.

D.    Privileges may be terminated at any time without any reason or cause. Volunteer staff shall have no right to appeal the decision. The wishes of the patient shall be considered where feasible in the selection of a Staff member to continue care.

## SECTION 13   TELEMEDICINE PRIVILEGES

A.    Telemedicine involves the use of electronic communication or other communication technologies to provide or support clinical care at a distance.

B.    Practitioners requesting privileges for telemedicine shall follow the procedure outlined in Article 6, Section 6 D, "Remote Provider and Telemedicine Privileges" of the Medical Staff Bylaws.

## ARTICLE IV.   RELINQUISHMENT OF APPOINTMENT
## AND/OR CLINICAL PRIVILEGES

## SECTION 1.   VOLUNTARY RELINQUISHMENT OF APPOINTMENT AND/OR CLINICAL PRIVILEGES

Voluntary relinquishment of appointment and/or Clinical Privileges is not reportable to the National Practitioner Data Bank and is not subject to due process. A practitioner's resignation must be submitted in writing to the President of the Medical Staff or designee, and must specify the effective date of the resignation. This action will be formally accepted only after all medical record obligations have been satisfied. If relinquishment of either membership or privilege(s) is done in an attempt to avoid a corrective action or in lieu of formal action due to performance and/or disciplinary issues, the action will be reportable to the National Practitioner Data Bank via the State of Washington, Department of Health, in accordance with statutory requirements.

## SECTION 2.   DENIAL, REVOCATION, LIMITATION, SUSPENSION, REDUCTION OF CLINICAL PRIVILEGES

Whenever, on the basis of information and belief, the Chief Executive Officer, the President of the Medical Executive Committee or their designated representative(s), has cause to question:

A.      The clinical competence of any Medical Staff appointee;

B.      The care or treatment of a patient or patients or management of a case by any Medical Staff appointee;

C.      The known or suspected violation by any Medical Staff appointee of applicable ethical standards or the Bylaws, policies, Rules and Regulations of the Hospital or its Board or Medical Staff, including but not limited to the Hospital's quality assessment, risk management, and utilization review programs; or

D.      Behavior or conduct on the part of any Medical Staff appointee that is considered lower than the standards of the Hospital or disruptive to the orderly operation of the Hospital or its Medical Staff, including the inability of the appointee to work harmoniously with others;

He/She has the authority to suspend all or any portion of the Clinical Privileges of the practitioner. Such precautionary suspension shall become effective immediately upon imposition, in accordance with Article IV, Section 1 and 2, of the Medical Staff Bylaws.


## ARTICLE V.   ALLIED HEALTH PROFESSIONALS


### SECTION 1.  ALLIED HEALTH PROFESSIONALS - GENERAL

A.      Allied Health Professionals are not members of the Active Medical Staff, and accordingly, have none of the rights of Active Medical Staff members.

B.      Allied Health members consist of independent and dependent professionals.

C.      Every Allied Health Professional shall be covered by and furnish evidence of professional liability insurance coverage in the same amounts as required by Active Medical Staff members as described in Article 1, Section 1,A,4.

D.      The Hospital retains the right, either through the Chief Executive Officer or upon recommendation of the Medical Executive Committee to suspend or terminate any or all of the privileges or functions of any Allied Health Professional without recourse on the part of such person(s) or others to the hearing procedure of the Medical Staff Bylaws, policies and procedures.

E.      Independent or Dependent Allied Health Professionals who are to be terminated or curtailed shall be notified in writing by the Chief Executive Officer or designee of the reasons for such action and, if they so request, within thirty (30) days, shall be entitled to have such action reviewed by the Medical Executive Committee. At any review meeting, the practitioner shall be allowed to be present and participate without a vote. The

Medical Executive Committee can recommend to accept, reject or modify the decision to terminate or curtail subject to review and final decision by the Board.

## SECTION 2.  INDEPENDENT ALLIED HEALTH PROFESSIONALS

A.  This category of Allied Health Professionals will consist of health care providers, other than Active Medical Staff members, who are licensed in the State of Washington to practice independently.  They may be privileged to admit and/or provide specific medical care to patients within their scope of practice and Clinical Privileges approved by the Board.  This includes but is not limited to certain Advanced Registered Nurse Practitioners and Clinical Psychologists (Ph.D.). See "Allied Health Professionals Functional Descriptive Summaries" in the Credentialing Guidelines for Allied Health Professionals.

B.  Independent Allied Health Professionals shall have their application processed in the same manner as applicants of the Active Medical Staff.  Application for Clinical Privileges shall be processed in accordance with policies for clinical privileging.

C.  Temporary privileges for Independent Allied Health Professionals will be processed in the same manner as for Medical Staff members.

D.  Independent Allied Health Professionals with admitting privileges are required to obtain a comprehensive medical consultation from an appropriately credentialed Active Medical Staff member prior to major diagnostic or therapeutic interventions or within twenty-four (24) hours of admission, whichever comes first, except in the case of uncomplicated labor and delivery.  Medical Staff consultation is required prior to transfer of a newborn or other patient to another facility.

1.  Mental Health Psychiatric Nurse Practitioners may independently participate in the management and care of the inpatient and exercise independent judgment in area of competence without consultation from an active medical staff member.

a.  The mental health nurse practitioner will contact the sponsoring/supervising physician for the following situations:
1)  Severe Acuity – for example
a)  Medical complication
b)  Pain medication management
c)  Suicide attempt involving high lethality – guns, hanging, carbon monoxide, jumping from bridge
d)  Suicide attempt during hospitalization
2)  Prolonged stay (beyond average length of stay)
3)  Disgruntled and/or severely angry patient or family
4)  Patients placed in restraints

E.  Independent Allied Health Professionals may, as a condition of continued privileges, be required to attend meetings involving the clinical review of patient care in which they participate.

F.  Independent Allied Health Professionals who are not granted admitting privileges shall:

1. Exercise independent judgment in their area of competence.  However, a member of the Active Medical Staff shall have the ultimate responsibility for the patient's general medical condition;

2. Participate directly in the management and care of the patients under the general supervision or direction of an Active Medical Staff member;

3. Record reports and progress notes on the patients' records and write orders for treatments to the extent established in the Rules and Regulations and Credentialing Manual of the Medical Staff Bylaws provided that such orders are within the scope of their license, certificate, or other legal credentials and  granted privileges.

4. May not admit patients to nor discharge them from the Hospital.


## SECTION 3.   DEPENDENT ALLIED HEALTH PROFESSIONALS

A. This category of Allied Health Professionals includes but is not limited to: physician assistants and surgical assistants.

B. Professionals in this group must remain under the control and active supervision of specific members of the Active Medical Staff to ensure adequate overall patient protection.  The sponsor shall present a written statement of the clinical duties and responsibilities to the section and to the Executive Committee for review and approval. The requested privileges must be approved prior to utilizing said individual within the Hospital.  The sponsor shall complete such forms as may be requested by the Medical Executive Committee or Designee.

C. Temporary privileges for this category of Allied Health Professionals will be processed in the same manner as for Active Medical Staff members.

D. The sponsor of the dependent Allied Health Professional shall assume full responsibility, and shall be fully accountable for the conduct of said individual within the Hospital. Further, it is the responsibility of the sponsor of the dependent Allied Health Professional to acquaint said individual with the applicable rules and regulations of the Medical Staff and the Hospital as well as appropriate members of the Active Medical Staff and Hospital personnel with whom the Allied Health Professional will have contact in the Hospital.

E. The clinical duties and responsibilities of a dependent Allied Health Professional within the Hospital shall terminate if the Active Medical Staff appointment of the sponsor is terminated for any reason or if the sponsor's Clinical Privileges are curtailed to the extent that the professional services of said individual within the Hospital are no longer necessary to assist the sponsor unless a new sponsor is identified and approved in accordance with the terms of this Credentials Manual.

F. "Credentialing Guidelines for Dependent Allied Health Professionals" have been incorporated into the Credentials Manual.

## SECTION 4.   OTHER HEALTH PROFESSIONALS

All other Health Professionals are processed, supervised and evaluated through the Human Resources mechanisms.  This category consists of, but is not limited to, surgical technicians; vascular technicians, EEG technicians, and Registered Nurses which are employed by an entity or Active Medical Staff member to provide job functions within the Hospital.

## ARTICLE VI.   CONFIDENTIALITY OF MEDICAL STAFF CREDENTIALS FILES

A.      It is the policy of FHS to protect the confidentiality of credentials files in accordance with all applicable legal requirements.  A policy to this effect will be on file in the Medical Staff Office.

B.      Medical Staff members who have access to credentialing information/files shall agree in writing to protect the confidentiality of information in credentials files and other Medical Staff records, and to use that information only for purposes that promote peer review and quality improvement efforts.

## ARTICLE VII.  AMENDMENTS

An amendment to these Rules and Regulations may be made under provisions of Article XII, Section 2, of the Medical Staff Bylaws.

## ARTICLE VIII. ADOPTION

After adoption by the Active Medical Staff as an amendment to the Bylaws, last revised in 1996, this Credentialing Manual, together with appended Bylaws, Rules and Regulations, shall replace any previous edition and shall become effective when approved by the Board.

ADOPTED by the Active Medical Staff on September 7, 1996.

APPROVED by the Board on November 22, 1996.